GIANT TIGER CORPORATION OF CAMDEN, NEW JERSEY. PROSECUTOR, v. BOARD OF COMMISSIONERS OF THE CITY OF CAMDEN, DEFENDANT.

Argued January 18, 1939—Decided March 11, 1939.

Before Justices Trenchard, Parker and Perskie.

For the prosecutor, *Bleakly, Stockwell & Burling* (*Henry F. Stockwell,* of counsel).

For the defendant, *Firmin Michel* (*William J. Shepp,* of counsel).

The opinion of the court was delivered by

PARKER, J. This writ of *certiorari* brings up a licensing ordinance of the city of Camden. The attack seems to be upon the ordinance as a whole and not upon any conviction thereunder. Some twelve reasons are advanced, but the argument in general and the brief do not seem to treat of any particular reason separate from the others. Generally speaking, the claim is that the ordinance is not within the power of the municipal body, that it is unreasonable, discriminatory, confiscatory, special in its application, and that it violates the equal protection clause of the Fourteenth Amendment of the National Constitution.

The ordinance under consideration is modeled closely after an ordinance of the city of Trenton in *pari materia,* which was considered by this court in *Giant Tiger Corp. et al.* v. *Board of Commissioners of Trenton,* 11 *N. J. Mis. R.* 797, affirmed on opinion below, 113 *N. J. L.* 34. A somewhat similar case is *Hoffman* v. *Borough of South River,* 13 *N. J. Mis. R.* 618. In that also the attack was on the ordinance, and a writ of *certiorari* was denied. Although it is not definitely claimed that the Camden ordinance differs in any essential particular from the Trenton ordinance, it may be advisable to exhibit the two in parallel columns for purposes of comparison, noting that it has been necessary to make a slight change in the order of sections in the Camden ordinance for the purpose of parallelism. The two ordinances follow:

TRENTON

*Sec. 1.* "That no person, firm, partnership or corporation shall engage in the business of operating, conducting or maintaining a food market within any building or structure within the limits of the City of Trenton, and renting or leasing more than four concessions in any such building or structure to persons,

CAMDEN

*Sec. 1.* "No person, firm or corporation shall operate, conduct or maintain, or engage in the business of operating, conducting or maintaining a food market within any building or structure within the limits of the City of Camden, New Jersey, and renting or leasing more than four concessions in any such

natural or artificial, to carry on various kinds and types of businesses therein, without having first obtained a license therefor.

(Section 1 continued)

"The license fee shall be the sum of One Hundred ($100.00) Dollars per year for each and every concession and/or department rented, leased or operated in any such building or structure, such fee being imposed for the purpose of revenue."

*Sec. 2.* "That applications for licenses shall be made to the City Clerk, from time to time, on blank forms to be supplied by him, as concessions and/or departments are rented, leased or operated by the party operating, conducting or maintaining such market."

*Sec. 3.* "That this ordinance shall not be held to apply to any market conducted solely for the sale of food products, cut flowers, potted plants, plants, shrubs, trees and seeds, nor to any open-air market."

*Sec. 4.* "That any person, firm, partnership or corporation operating, conducting or maintaining any such market, who shall rent or lease building or structure, to persons, natural or artificial, to carry on various kinds or types of businesses therein without having first obtained a license therefor."

*Sec. 4.* "The license fee shall be the sum of $200.00 per year for each and every concession or department, rented, leased or operated in any such building or structure. The license fee imposed by this ordinance is for the purpose of revenue."

*Sec. 2.* "The City Clerk is hereby authorized to issue any such license upon the payment by the applicant of the proper fee therefor, as hereinafter provided."

*Sec. 3.* "Every such license shall remain in force and be valid only for the term of one year from the date of issuance of said license and shall apply to the person or persons to whom granted and shall not be transferable."

*Sec. 5.* "This ordinance shall not be held to apply to any Municipal Market."

*Sec. 7.* "Each and every person, firm or corporation violating any of the provisions of this ordinance shall, upon conviction, be fined not more than $200.00 or be im-

any such concession and/or department in violation of any of the provisions of this ordinance shall forfeit and pay a penalty not to exceed the sum of Two Hundred ($200.00) Dollars." , "and each day such violation shall be continued shall be deemed and taken to be a separate and distinct offense."

prisoned in the place provided by the municipality for the detention of prisoners for not more than ninety days or both in the discretion of the Police Judge."

*Sec. 6.* "Each day's operation, conduction or maintenance, or engagement in the business of operating, conduction or maintaining an unlicensed food market, shall constitute a separate violation of this ordinance."

The decision in the Trenton case would seem at first blush to be dispositive of the present writ; and, indeed, this is the sole argument made for the respondent. For the prosecutor, however, it is argued that the attack on the Trenton ordinance failed to present several reasons advanced in the present case, and because of which we are asked to set the Camden ordinance aside. The reasons are not discussed *seriatim* in the brief, nor, as we recollect, were they so discussed at the argument, and the brief may be fairly described as a running commentary divided into points which are numbered, but no particular proposition stands at the head of any of the numbers. It is therefore necessary to deal with the case much in the same manner.

The prosecutor is clearly, and admittedly, within the purview of the ordinance. It operates a food market within a building in Camden and rents or leases more than four concessions therein to natural or artificial persons to carry on various kinds or types of businesses therein. The case shows that there are twenty-seven departments in all, the principal one of which is the grocery department which, according to the testimony of the president of the corporation, has gross receipts of about $20,000 a week or, as counsel put it, a million dollars a year; that the gross receipts of the twenty-six "concessions" are approximately $30,000 a month or an

average of $1,154 a month or nearly $14,000 a year. Some concessions are larger and some smaller, the smallest being ten feet by seven feet (jewelry) and the restaurant eighteen feet by forty feet. As we read the ordinance, the prosecutor is liable for the license fee of each and every concession. The various concessions were described by the witness Bell: "*A.* Candy, cigars, cookies—— *Q.* Are those separate departments? *A.* Yes, sir. *Q.* Or concessions? *A.* Yes. Dairy, delicatessen, dresses, drugs, sea-food, florist, fruits and vegetables, hosiery, house furnishings, ice cream, jewelry, old gold, liquor, meats, millinery, paints, radio, restaurant, shoe repair, auto accessories, toys, yard goods, newspapers." The concessions are under the direct supervision of the prosecutor, which maintains the building and does all the advertising for the entire store, and supplies light and heat and public liability insurance, all of which is covered by the rents paid by the concessionaires. We do not observe that the rents paid by these concessionaires, either individually or as a total, are stated in the evidence, although it appears that some pay a stipulated rent and others pay a percentage of gross receipts. Each concessionaire pays his own personal tax.

It is claimed for the prosecutor that the decision in the Trenton case, 11 *N. J. Mis. R.* (at *p.* 798), dealt merely with the "distinction between food markets where other articles are sold and food markets selling food, flowers, seeds and plants exclusively." It is true that that point was considered, but it was not the only point, for it was said on page 799: "A municipality is not obliged to require a license fee from food markets, and because it does exact a license fee from a food market where general merchandise is sold neither seems to us unreasonable, arbitrary or discriminatory, but on the contrary a wise use of the power granted." It is objected that the ordinance does not include cases where the principal operator does not himself operate a food market; nor fix the license fee per concession either according to the space occupied or the amount of business done; nor does it apply to cases where the operator of a food market himself operates the other departments, but applies only to a case where the

main operator runs a food store and rents out four or more concessions for various kinds or types of business. All this seems true as a matter of fact and of construction of the ordinance, and consequently the question is, whether the ordinance is to be considered unreasonable and discriminatory in limiting the requirement of a licensee fee to establishments where the business owner or controlling element is that of a food store.

As we understand the general rule, it is that an ordinance of a municipality which is within the four corners of the statute law authorizing it to enact ordinances, is presumed to be reasonable; and that the burden of proof is on him who claims the contrary. Starting with this presumption, we have carefully considered the evidence and the arguments of counsel, oral and written, and are of the opinion that the ordinance has not been shown to be unreasonable. This, as already noted, was the opinion of this court in the Trenton case, concurred in by the Court of Errors and Appeals.

Establishments like that in the present case may fairly be said to be descendants (like the department store, perhaps), of the old-fashioned city markets. These markets are fewer than they used to be but are still to be seen here and there. In fact, a "municipal market" is expressly recognized by the ordinance under review. The markets in Baltimore and Washington, for example, were famous. The old Newark city market was abolished comparatively recently. It is common knowledge that these markets were organized primarily for the supply and sale of food products but were not limited to that business. Food, of course, is the prime requisite of life and is something that must be had every day and, as a general rule, is purchased every day; and, consequently, the food store more than any other kind of a store has its regular daily run of customers; and these coming in the first instance for food, necessarily take advantage of the proximity of shops where other articles less frequently required are to be had. The natural result is that in conjunction with the food stores in a public market, there will grow up a neighboring group of shops where other things are for sale, such as those men-

tioned in the list given above, and there results a mutual benefit both to the food shop and the other shops by bringing them together. Hence, it is not to be considered surprising that an establishment like that of the prosecutor should exist in which the principal occupation is that of selling food. It is a privately owned market, an old-fashioned country store, greatly magnified, whereto the public may resort for the purchase of the usual requirements of life, and wherein the primary sale of food is a "leader" attracting customers to buy other merchandise. This food feature, we think, fairly differentiates it from the ordinary department store which, as a rule, does not sell food, and from establishments conducted on the same system as that of the prosecutor, but not dealing in food. In short, it is to the advantage of the food market that these other concerns be grouped around it, and it is still more to the advantage of the other concerns that the food market is every day drawing a continuous stream of customers who, if they wish to purchase something else, naturally would gravitate to one or more of the concessions as a convenient place to find what they desire. The difference between a place run on this plan and another place where there is no food market seems obvious.

In view of the foregoing discussion, it appears to us clear that a concern like the prosecutor, running a business as the prosecutor runs it, is reasonably and fairly to be differentiated from the other classes suggested in the argument; and this necessarily leads to the conclusion that if the city government elects to exert its taxing power on a concern of that kind, its decision in that regard cannot be held unreasonable or discriminatory.

Another claim is that the tax imposed by way of license fees, viz., $200 per concession, is confiscatory. We think that when the matter is considered in view of the figures that are in evidence, this claim is entirely without substance. As has already been noted, the volume of grocery sales is stated to be about a million dollars a year, and the receipts of the twenty-six departments other than grocery are put at $360,000 a year. This, of course, makes a total of $1,360,000. The

license fees of twenty-seven departments at $200 amount to $5,400 a year, and this is about four-tenths of one per cent. of the total sales; and if the subordinate departments be taken separately, we find the figures work out as follows: gross sales $360,000; tax on twenty-six departments at $200 each, $5,200, which is something less than one and one-half per cent. on the gross sales of those departments. Now when it is considered that the present sales tax in New York City is two per cent. on the amount of the sales, and that the same tax for a short time was imposed in New Jersey (*Pamph. L.* 1935, *pp.* 850, 899), there seems to be nothing unreasonable or confiscatory about the amount of the concession fee. We may go a step further and look at the tax on gasoline. The net price of gasoline to-day, exclusive of tax, is about twelve cents a gallon. The state imposes a tax of three cents and the national government a tax of one cent, or four cents on every twelve cent purchase, which is a tax of thirty-three per cent. In comparison to this the levy of four-tenths of one per cent. sinks into insignificance, and that of one and one-half per cent. certainly cannot be called unreasonable or confiscatory. True, a tax of one and one-half per cent. on sales may bear hard on a minor concessionaire; but for that matter so does a license to sell liquor at retail, which is uniform for the same class of liquor business, and if the licensee cannot sell enough liquor to make it profitable to pay the license fee, he simply goes out of business. But we are unaware of any claim of confiscatory taxation being made in such case. As a matter of fact, the testimony for prosecutor shows that one of the twenty-six concessionaires is in the liquor business, and that he pays an excise tax of $500 a year, and a local license tax of the same amount. The prosecutor submitted no evidence touching the percentage of profit in the various concessions, but as to the food store the testimony is that the mark-up in the case of groceries held for resale is approximately ten per cent.; and that only "a small percentage" of the groceries is priced lower than in other grocery stores.

There is a group of seven cases which were argued before another part of this court at the present term, involving a

license fees of $5,000 and $10,000 based on the "self service" feature, and the prosecutor before us is also one of the prosecutors in that group. The court has set aside the ordinance in those cases, but is careful to point out that they are on a different footing from the case before us, which naturally is to be decided on its own merits.

One section of the brief is devoted to a presentation of federal cases in connection with the constitutional provision in the Fourteenth Amendment "nor shall any State * * * deny to any person within its jurisdiction the equal protection of the laws." The brief quotes from *Frost* v. *Corporation Commission,* 278 *U. S.* (at *p.* 522) ; 73 *Lawy. Ed.* 489; 49 *Sup.* (at *p.* 238), in which the opinion itself quotes the rule that "the classification, in order to be valid, must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike." We have no quarrel with this rule. It runs through all our cases relating, for example, to the prohibition of special legislation regulating the internal affairs of towns and counties. Constitution, article IV, section VII, paragraph 11. There is a long line of such cases, and for present purposes it is sufficient to cite *Richards* v. *Hammer,* 42 *N. J. L.* 435; 44 *Id.* 667, 671, and *Alexander* v. *Elizabeth,* 56 *Id.* 71, both cited in the brief; also one very recent case, *Hetrick* v. *Roberts,* 117 *Id.* 584; affirmed in 118 *Id.* 586. As regards the requirement that municipalities empowered by statute, as here, to license occupations for revenue should follow a similar rule, the cases of *Siciliano* v. *Neptune,* 83 *Id.* 158; *Morgan* v. *Orange,* 50 *Id.* 389 ; *Muhlenbrinck* v. *Commissioners,* 42 *Id.* 364, and *Heetner* v. *Newark,* 12 *N. J. Mis. R.* 560, also cited in the brief, present the law of this state, but the case at bar is not in conflict with them. The question in this phase of the case, and the whole question, is whether the treatment of food markets renting or leasing more than four concessions as a class for special licensing, is "unreasonable, arbitrary or discriminatory" to quote the Supreme Court opinion in 11 *Id.* (at *p.* 799), the Trenton case. That court held a class of

"food markets where general merchandise is sold" is a proper class. The matter of drawing the line at four concessions does not seem to be discussed in the opinion, but as we view the matter, it was within the power of the council to subdivide that class into food markets renting out many concessions and those renting out few such concessions, so long as the distinction does not arise from corrupt or unworthy motives, which is not claimed here. If so, the line must be drawn somewhere, and the location of that line is a matter for the legislative body of the municipality so long as the choice is not unreasonable. We cannot say that a limit of four concessions is unreasonable. That limit is the same as in the Trenton case, and in the South River case, *ubi supra,* and does not seem to have been specifically challenged in either case.

We conclude that the writ of *certiorari* should be dismissed, with costs.